THE CENTRAL RAILROAD AND BANKING CO. *v.* STRICKLAND.

1. Under the law and rules prescribed by the railroad commission of this State, it is the duty of railroad companies to keep their ticket-offices open for the sale of tickets for a reasonable time before the departure of trains from all stations, provided that offices at way stations may be closed one minute before the arrival of trains; and it is the duty of passengers to use proper diligence in supplying themselves with tickets before getting upon the trains. A railroad company is not bound to keep a ticket-office open each and every minute up to the time it may lawfully close the same, provided a reasonable opportunity is afforded all persons desiring tickets to obtain them; nor is a passenger bound to wait at a ticket-office an unreasonable time for the appearance of the agent to sell him a ticket, or to call again and again at the office to procure one, provided, in good faith and with due diligence he endeavors to do so before the time for closing the office arrives. In each case, it is a question to be determined by the jury whether or not the parties, respectively, performed the corresponding duties devolving upon them, and it is not the province of the court to decide what particular facts will constitute negligence or diligence by either party, and thus restrict the jury in the exercise of their duty in this respect.

2. If a passenger has not been afforded a reasonable opportunity to purchase a ticket at the station where his journey began, he is not bound to leave the train at a station *en route*, and purchase a ticket back to the station whence he started, and another to his destination. If he is rightly on the train without a ticket, it is his right to complete his intended journey by paying the ticket rate for his fare.

3. A passenger is not bound to comply with the rules of the company unless such rules are reasonable.

4. A railroad company has a right to employ a colored train-hand, and a conductor may properly call upon him to assist in ejecting a passenger who ought to be ejected from the train. If a white passenger is wrongfully ejected from a train, the fact that a colored train-hand was called upon to assist in so doing will not make the company liable for greater damages than should be recovered if the train-hand had been a white man.

5. If a passenger is wrongfully ejected from a railroad train and entitled to damages, the jury in fixing the amount of same may take into consideration "the inconvenience he was put to by being put off."

6. The verdict in this case was so excessive as to suggest bias or prejudice on the part of the jury, and cannot be sustained.

November 14, 1892.

Railroad. Passenger. Ticket-office. Charge of court. Damages. Before Judge RICHARD H. CLARK. Clayton superior court. September term, 1891.

Strickland sued the railroad company for damages because of his ejection from one of its trains, he being thereon for the purpose of going from Jonesboro to Forest. He obtained a verdict for $1,500. Defendant's motion for new trial was overruled, and it excepted. The motion contains the grounds that the verdict was contrary to law and evidence, and that it was grossly excessive and evidently the result of prejudice and bias. The special grounds are as follows:

(4) Refusal to charge the jury thus : " If Strickland desired to board the train of the defendant, it was his duty to procure a ticket if he desired to ride at three cents per mile, or use diligence in the effort to procure a ticket. If Strickland went into the office of the defendant company to procure a ticket and was informed that the agent was in another room attending to his business, then Strickland could not leave the ticket-office several minutes before the arrival of the train without calling again, and without further effort to get a ticket, and then claim the right to ride on the cars at three cents per mile."

(5) Refusal to charge: " It is not the duty of the defendant to keep an agent at the ticket-office every minute, but simply keep the office open for a reasonable time, and in a reasonable manner, for persons to procure tickets. And you will look to what was done between the time that Strickland went into the office and the arrival of the train, to determine if Strickland had a reasonable time in which to buy a ticket,—were tickets sold to other persons after Strickland went into the office and before the arrival of the train?—and look to all the facts to determine if he could have gotten a ticket."

(6) Refusal to charge: "In the exercise of ordinary diligence it was the duty of Strickland to employ the time he was within reach of depot in the effort to procure a ticket."

(7) Refusal to charge: "If Strickland could not have purchased a ticket at Jonesboro, but could have purchased a ticket at Morrows [an intermediate station] for both ways, he should have done so."

(8) Refusal to charge: "A passenger owes duty to the railroad company as well as the railroad company owes the passenger duties; therefore the passenger should use all reasonable care and diligence to conform to the rules of the company."

(9) Refusal to charge: "I charge you that a person desiring to take passage on a railroad train should use diligence to procure a ticket. It would not be sufficient that a person called one time to get a ticket, if he had opportunity to call again; but he must, up to the time he leaves the ticket-office to board the train, make effort to get a ticket."

(10) Refusal to charge: "The railroad company had the right to employ a negro as a train-hand, and the conductor had the right to call on such train-hand to help him eject a passenger, and the fact that a negro was employed as a train-hand, and the fact that the train-hand called by the conductor to help him was a negro, cannot affect the liability of the defendant any more than if the train-hand had been a white man." It is stated in the motion that this request to charge was made because counsel for plaintiff in his argument to the jury asked for vindictive damages for two or three reasons, among them, because the conductor called a "nigger" to assist him in putting plaintiff off the train.

(11) Refusal to charge: "If Strickland could have procured a ticket and did not do so, then the conductor

had the right to make him pay four cents a mile or eject him from the train."

(12) The court charged that the ticket-office should be kept open a reasonable time before the departure of the train. This was alleged to be error because, as the evidence showed, Jonesboro was a way-station, and the rule of the company was that the ticket-office at way-stations might be closed for one minute before the arrival of a passenger-train.

(13) Error in charging: "Now if you should adjudge that the railroad office was substantially open, and a reasonable time before the departure of the train from the station, then did Mr. Strickland use proper diligence in supplying himself with a ticket? If, gentlemen of the jury, he used proper diligence in supplying himself with a ticket and failed to be supplied, was not supplied, then so far as that branch of the case is concerned, it would have been made out."

(14) Error in charging: "You have a right to consider the inconvenience he was put to by being put off."

The evidence introduced by plaintiff, bearing upon the question made as to the excessiveness of the verdict, was: The ticket rate of fare from Jonesboro to Forest was twenty-five cents, and he had only fifty cents (which he had borrowed) to carry him to Forest and back again. Failing to procure a ticket because, as he alleges, of the absence of defendant's agent from the proper place in the depot where tickets were sold, he boarded the train. The conductor came and asked for his fare; he handed the money to the conductor, who took it and asked where he was going. He replied he was going to Forest, and the conductor said, "Thirty-two cents." He replied the fare was only twenty-five cents from Jonesboro to Forest, and the conductor said it was thirty-two cents without a ticket. He told the conductor he went to

the ticket-office to get a ticket and the agent was not there, and he did not want to be left and went and got on the train anyhow, and that he was not to blame. The conductor said, "If you don't pay thirty-two cents, you will have to get off." He replied that he would not, that the conductor could put him off if he wanted to, but he would not get off. The conductor ordered him to get off several times, first telling him to get off at Morrows. He replied he would not do it, that he had the money to pay. After they left Morrows the conductor asked him if he were going to pay the thirty-two cents, and he said, "Here's the fare, twenty-five cents from Jonesboro to Forest." The conductor took it and said, "Eight cents more." Plaintiff would not pay the eight cents. The conductor told him he would have to get off, pulled the bell rope and stopped the train. He asked plaintiff again to get off, offering the money back; plaintiff would not take it; he caught plaintiff by the arm, took him to the steps and handed him the money; plaintiff would not take it, and he threw it off on the ground. Before being put off plaintiff told the conductor he had heard that his (plaintiff's) little nephew was having spasms, and they had sent for him to come up to Forest. He was in the smoking-car where were a good many men but no women. The bulk of the train was behind, and the windows were all full of people looking out. The people in the smoking-car saw the conductor when he led plaintiff to the steps, and heard the conversation between them. He was put off not very far beyond Morrows station, three or four miles from Forest, about five o'clock P. M., on the last Saturday in June. He walked and ran from there to Forest. He could not say what time he reached his destination, but went there quickly. When he was put off a heavy cloud was rising with thunder, and he hurried and reached the station

before it rained, but was about as wet as if the rain had caught him. He was not acquainted with anybody immediately on the road. Before he was put off, the conductor stepped out of the smoking-car, went into the rear car and came back with a big yellow negro, one of the train-hands, who was standing right at the door when he was being led out. No one touched him but the conductor, who took him by the arm, pulled him and said, "Get off." He did not jerk but caught plaintiff by the arm, and plaintiff walked out.

HALL & HAMMOND and W. L. WATTERSON, for plaintiff in error.

DORSEY & HOWELL, J. B. HUTCHESON and HARRISON & PEEPLES, contra.

LUMPKIN, Justice.

1. The motion for a new trial assigns error upon various refusals of the court to charge the jury, as set forth in the 4th, 5th, 6th, 9th and 11th grounds thereof, and also upon charges made by the court, as stated in the 12th and 13th grounds, all of which will appear in the reporter's statement. Without discussing these numerous grounds seriatim, we have endeavored, in the first head-note, to formulate and condense what we understand to be the law applicable. In the transaction of business between a railroad company and the public, there should be an exercise of good faith on both sides, and each should conscientiously endeavor to deal fairly with the other. In the matter of keeping an office open for the sale of tickets, the agent of the company should not so neglect the same as to subject passengers to unnecessary trouble, delay and inconvenience in procuring their tickets; nor, on the other hand, should the temporary absence of the agent from his office on necessary business afford a passenger a pretext for failing to purchase a ticket when, by a little patience, he could easily

have obtained one. Persons desiring tickets should exercise proper diligence in applying for them, but are not bound to wait upon the agent an unreasonable length of time, nor to call again and again at his office, when proper attention to his business would have rendered this unnecessary. It is also true that the agent at a way-station, who has various duties to perform, is not bound to keep the ticket office open, and remain in attendance thereupon, every moment up to the time when he may lawfully close it. It seems to us there should be no great difficulty in any given case in determining whether or not the passenger exercised proper diligence, or the agent gave fair and reasonable attention to his duties. Applying the rule that good faith, common honesty and courteous treatment should be observed on both sides, any fair mind ought to be able to decide readily who is in fault when a passenger fails to procure a ticket. It is at last simply a question for the jury, and in solving it they should apply to the facts proved the rule of the law above laid down. As to the relative rights of a passenger found upon a train without a ticket, and of the company in such a case, see *Ga. So. & Fla. R. R. Co.* v. *Asmore,* 88 *Ga.* 529.

2. When a passenger for want of a reasonable opportunity to purchase a ticket has boarded a railroad train, and in consequence has a right to do so without a ticket, he is entitled to complete his journey by paying the conductor the ticket rate for his fare. There is no rule of law, of which we have any knowledge, requiring him to leave the train at a station *en route* and purchase a ticket back to the one whence he started, and another to his destination. A request to charge that the plaintiff was under any obligation to do this, was properly refused. The request was based on the idea that a ticket from the intermediate station to the station from which the plaintiff started, would have been good either

way; but be this as it may, no passenger rightly on a train without a ticket at the beginning of his journey should be subjected to any such inconvenience.

3. By one of defendant's requests the court was asked, in effect, to instruct the jury that passengers are bound to use all reasonable care and diligence to conform to the rules of the railroad company. It is clear, without discussion, that a passenger would not be bound to conform to an unreasonable rule of the company. The request being wanting in this necessary qualification, was of course properly refused.

4. It cannot be denied that a railroad company, or any other person, has the right to employ a colored servant, and may require of such servant the performance of all proper duties which fall within the scope of his employment. To establish the contrary of this proposition would lead to consequences utterly absurd and unreasonable, and would result in endless trouble and inconvenience. This is too plain for argument, and consequently there can be no wrong or impropriety in the employment by a railroad company of a colored train-hand; and it is equally apparent that this train-hand may, if necessary, be called upon by the conductor to assist in ejecting a passenger from the train who has no right to be upon it. If the passenger is lawfully and rightfully ejected, he certainly would have no cause of action against the company merely because a colored employee assisted in putting him off. This being true, the wrongful ejection of a passenger is not aggravated by the fact that the conductor called upon a colored train-hand for assistance in making such ejection. Of course, we do not mean to intimate that there may not be aggravating circumstances attending the improper expulsion of a passenger from a train, which should increase the amount of his damages for the wrong done him. Physical injuries, insults by word or act, personal

indignities, actual violence or unnecessary force, making an improper or unseemly demonstration, calling for assistance when it was manifestly not needed and the only effect of it would be to mortify and humiliate the passenger, and many other things of like character, may and should increase the damages in cases of this kind, and we do not desire to be understood as holding to the contrary. But we do rule distinctly and unequivocally that the race question is not properly involved in such transactions, and that it is unlawful to hold a railroad company liable for greater damages than the amount for which it would be justly liable were the employee aiding in the expulsion of the passenger a man of his own color. In our opinion, therefore, the court erred in refusing to charge the request contained in the 10th ground of the motion. Especially under the circumstances attending the trial of the present case, do we think the defendant company was entitled to have the jury instructed as to the law governing its liability in this respect. Counsel for the plaintiff, in arguing the case before the jury, had insisted that his client was entitled to greater damages because the conductor called upon a "nigger" employee to aid in putting him off. In fact, the "nigger" did not touch the plaintiff, but the charge requested was specially pertinent in view of the argument, and the refusal of it not improbably worked a hardship on the company.

5. The jury in fixing the amount of damages which should be allowed to a passenger for a wrongful expulsion from a railroad train, may take into consideration all the surrounding facts and attending circumstances, including, of course, "the inconvenience he was put to by being put off." This is one of the necessary elements in arriving at the proper amount to be allowed one upon whom a tort of this kind has been committed.

6. As this case will be tried again, we express no

opinion as to whether or not the plaintiff should re-
cover any amount whatever; but we adjudge that the
verdict rendered at the last trial was so grossly large
and excessive that it cannot be sustained.   Even if the
plaintiff was without fault and the railroad company
entirely in the wrong, there was nothing in the facts or
circumstances shown by the record to warrant a verdict
for the sum of $1,500.00.   We are constrained to say
this verdict must have resulted from bias or prejudice,
and for this reason alone we would deem it our duty
to order a new trial.   We do this the more readily,
however, because of the argument of plaintiff's coun-
sel to which reference has already been made, and the
refusal of the court to counteract the effect it must have
produced upon the minds of the jury by giving the
charge requested.                    *Judgment reversed.*